**In re GLOBE METALLURGICAL, INC., Debtor.**

**No. 03–B–12006(CB).**

United States Bankruptcy Court, S.D. New York.

July 15, 2004.

---

Hiscock & Barclay, LLP, Timothy J. Walker, Susan R. Katzoff, Of Counsel, Buffalo, NY, Attorneys for Niagara Mohawk Power Corporation.

Piper Rudnick LLP, Timothy W. Walsh, Leonard L. Gordon, Jeremy R. Johnson, Of Counsel, New York, Attorneys for Globe Metallurgical Inc., Debtor and Debtor-in-Possession.

Arent Fox, PLLC, Andrew I. Silfen, Leah M. Eisenberg, Of Counsel, New

York, Attorneys for Marco International Corporation and MI Capital, Inc.

## MEMORANDUM DECISION AND ORDER REGARDING MOTION OF ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM BY NIAGARA MOHAWK POWER CORPORATION

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

This matter comes before this Court by motion filed on May 19, 2004, by Niagara Mohawk Power Corporation ("Niagara Mohawk") for an order allowing payment of administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) in the amount of $4,679,302.82 representing actual energy usage by Globe Metallurgical, Inc. (the "Debtor") and for such other relief as the Court deems just and proper. The Debtor has filed opposition. Marco International Corporation and MI Capital filed a Joinder to the Debtor's Objection. This Court has allowed additional submission from the Debtor and Niagara.

### BACKGROUND

On April 2, 2003 (the "Petition Date"), the Debtor commenced a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Prior to the petition date the Debtor entered into certain power contracts with Niagara Mohawk related to the supply of electricity to the Debtor's plant in Niagara Falls, New York (the "Niagara Facility"). The Niagara Facility received power pursuant to the following power contracts: (a) Expansion Power [1] Allocation and Service Agreement, dated April 20, 1989 ("Expansion Contract"), (b) Agreement for Replacement Power [2], dated April 8, 1987 ("Replacement Contract I"), and (c) Agreement for Replacement Power, dated July 11, 1994 ("Replacement Contract II," collectively with the Expansion Contract and Replacement Contract I, the "Niagara Contracts"). The low cost power that is provided pursuant to the Niagara Contracts was specifically allocated to the Niagara Facility pursuant to the Niagara Redevelopment Act (the "NRA"), 16 U.S.C. § 836(b)(3), and the Expansion Power Statute.

Pursuant to the NRA, Replacement Power is made available exclusively to industrial manufacturers in the Niagara region who purchased low-cost, hydro-electric power generated by Niagara Mohawk's hydro-electric plant known as Project 16 before it was destroyed in a June 7, 1956 rock slide. Similar to the federal mandated Replacement Power program, the Expansion Power program was created to provide much need low-cost power to eligible businesses, expressly for economic development purposes.[3] In the 1960's NYPA earmarked 250 MW of Niagara Project hydro-electric power as Expansion Power for sale to companies that created additional em-

---

1. Expansion Power is the 250,000 kW of firm hydro-electric power generated by the Power Authority of the State of New York ("NYPA") at its Niagara hydro-electric power project (the "Niagara Project") that is allocated exclusively to customers located within New York state within thirty miles of the Niagara Project to foster economic development. *See* N.Y. Econ. Dev. Law §§ 182 *et seq.* (Consol.2004); N.Y. Pub. Auth. Law § 1005 (Consol.2004)(the "Expansion Power Statute").

2. Replacement Power is the 445,000 kW of firm hydroelectric power generated by the NYPA at its Niagara Project that is made available to Niagara Mohawk for resale to eligible industrial users pursuant to the NRA.

3. *See* N.Y. Econ. Dev. Law §§ 182 *et seq.* (Consol.2004).

ployment on the "Niagara Frontier."[4]

On the Petition Date, the Debtor filed, among other things, an *ex parte* motion (the "Utility Motion") pursuant to Section 366 of the Bankruptcy Code, seeking an order (a) determining adequate protection of payment for future utility service; and (b) retraining Utility Companies[5] from altering, refusing or discontinuing such service to the Debtor. *See* Utility Motion.

The Court entered an order granting the relief requested in the Utility Motion and provided the utility companies an opportunity and mechanism to object the adequate assurance provided.

Niagara Mohawk subsequently filed an objection to the order. The Debtor and Niagara Mohawk reached a resolution of its objection to the Utility Order and on May 8, 2003 this Court approved a Stipulation and Order Resolving the Objection by Niagara Mohawk to the Debtor's Motion for Order Authorizing and Directing Debtor to Furnish Certain Utilities with Adequate Assurance of Payment and Directing Utilities to Continue Service (the "366 Order"). Pursuant to the 366 Order the Debtor was obligated to make certain monetary payments to Niagara Mohawk in connection with the Debtor's post-petition use of Niagara Mohawk's services. Specifically "commencing with June 1, 2003, the Debtor shall pay [Niagara Mohawk] twice a month, in advance, for its projected utility services for each month. The Debtor anticipates projected utility services ... of $428,540 per month, for the next twelve month period." *See* 366 Order. Upon the payment there was a "true up" component, in which the parties would reconcile their accounts every month. If there were ad-

justments to be made, those adjustments were to be credited on the second payment due that month. *Id.*

On December 31, 2003, the Debtor filed its plan of reorganization (as subsequently amended, the "Plan") and disclosure statement (as subsequently amended, the "Disclosure Statement"). The Disclosure Statement was approved by order of this Court dated February 9, 2004 and the Plan was confirmed on April 21, 2004. The Debtor pursuant to the Plan rejected the Niagara Contracts.

### DISCUSSION

Pursuant to section 365 of the Bankruptcy Code a debtor may "assume or reject any executory contract." 11 U.S.C. § 365. Section 365(a) was created to provide a debtor with the opportunity to maximize the value of the estate by allowing "the debtor to benefit from those contracts that are profitable and reject those which are unprofitable." *Bethlehem Steel Corp. v. BP Energy Co. (In re Bethlehem Steel Corp.),* 291 B.R. 260, 264 (Bankr.S.D.N.Y.2003)(citing *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1098 (2d Cir.1993); *In re Wedtech Corp.,* 72 B.R. 464, 467 (Bankr.S.D.N.Y.1987)). A Debtor's entitlement to time to assume or reject and executory contract is afforded to the Debtor until confirmation of a plan unless the court orders otherwise on request of a party to a contract. *11 U.S.C. § 365(d)(2).* To determine the effect of the rejection of an executory contract, this Court must start with subsection (g) of section 365 which provides that except as provided in subsection (h) and (i) of the same section, a rejection of an executory contract of the debtor constitutes a

---

4. To be eligible to receive Expansion Power, a customer must be located "with the state located within thirty miles of the Niagara Project." *See* N.Y. Pub. Auth. Law § 1005.

5. The Utility Companies subject of the Debtor's motion were listed in Exhibit A to the Utility Motion.

breach of such contract immediately prior top the filing of the petition for the relief. *11 U.S.C. § 365.* Although, the right of assumption or rejection exists, when a debtor makes use of the subject of the executory contract prior to its rejection, the parties to the executory contract may be entitled to an administrative claim pursuant to 11 U.S.C. § 503. *See 11 U.S.C. § 503(b)(1)(A).* *See also In re Thatcher Glass Corp.,* 59 B.R. 797 (Bankr.Conn. 1986). However, section 503(b) of the Bankruptcy Code is not a mere formality, this section not only limits the valuation of administrative expenses to those things that are actual and necessary costs of preserving the estate. *Sharon Steel Corp. v. Nat'l Fuel Distribution Corp.,* 872 F.2d 36, 39 (3d Cir.1989). The claimant has the burden of proving that its services provided such a benefit to the bankrupt entity. *In re Chateaugay Corp.,* 102 B.R. 335, 353–54 (Bankr.S.D.N.Y.1989).

 Generally, the rejection of an executory contract is treated as a breach of such contract and the existing default gives rise to a claim for damages usually in the status of a pre-petition unsecured claim. *See 11 U.S.C. § 365(g)(1); In re Spectrum Info. Technologies, Inc.,* 190 B.R. 741, 746 (Bankr.E.D.N.Y.1996)(rejection of executory contract gives rise to unsecured claim for damages rather than administrative expense priority); *In re Child World, Inc.,* 161 B.R. 349 (Bankr.S.D.N.Y.1993)(sublessee's claim for damages resulting from rejection of subleases was entitled only to general unsecured status, rather than administrative priority status, where bankruptcy court had authorized debtor to reject both prime and sublease). However, upon a showing by a claimant the components necessary to show a entitlement to an administrative priority the contract claim can become an administrative claim subject to administrative priority.

Now this Court has before it two varying arguments pertaining to the status, if any exist, of services provided by Niagara Mohawk to the Debtor. On one hand we have Niagara Mohawk asserting that they are entitled to administrative expense payments at the prevailing market rate for the post-petition actual energy usage and not the rates set forth in the Niagara Contract. And on the other hand the Debtor disputes Niagara's Mohawk's right to an administrative expense asserting that if a claim does exist it is simply a contract claim as a result of the rejection; additionally, if Niagara Mohawk is entitled to an administrative expense claim, which is no admission of the Debtor part, it is the contract rate not the market rate that should prevail to determine the amount of such a claim. This Court has reviewed and considered the motion, all the replies, and affidavits submitted.

## I. Administrative Expense Claim

 Section 503(b)(1)(A) of the Bankruptcy Code provides a priority for "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commission for services rendered after the commencement of the case." Those services rendered post-petition for administering the estate are afforded a first priority. *11 U.S.C. § 507(a)(1).* The priority that is afforded pursuant to sections 503 and 507 is provided to facilitate the debtor's reorganization efforts and to encourage third parties who may otherwise be reluctant to transact business with the debtor. *Amalgamated Ins. Fund v. McFarlin's Inc.,* 789 F.2d 98, 101 (2d Cir.1986)(citing *Cramer v. Mammoth Mart, Inc. (In Re Mammoth Mart, Inc.),* 536 F.2d 950, 953 (1st Cir.1976)). Section 503 provides a protection for such actual and necessary

services provided by third parties to the debtor post-petition.

■ Although Sections 503 and 507 offer this protection the standard to obtain this protection are to be narrowly construed. *Amalgamated Ins. Fund,* 789 F.2d at 100. Thus, there must be a strict construction of the terms "actual" and "necessary" therefore requiring that the estate actually receives "a real benefit from the transaction, before administrative priority will be granted on claims against the estate." *In re Drexel Burnham Lambert Group,* 134 B.R. 482, 488 (Bankr. S.D.N.Y.1991). The focal point of the allowance of a priority is to prevent unjust enrichment of the estate, not to compensate the creditor for its loss. *In re R.H. Macy & Co., Inc.,* 170 B.R. 69, 78 (Bankr. S.D.N.Y.1994). Thus, a court looks to the actual benefit to the estate and not the loss sustained by a creditor. *In re CIS Corp.,* 142 B.R. 640, 642 (S.D.N.Y.1992). The burden is upon the claimant to establish an entitlement to an administrative priority. *Drexel,* 134 B.R. at 489.

■ A claimant's expenses for providing post-petition goods and services to a Debtor may be afforded administrative status "(1) if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor-in-possession; and (2) only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business" (the Administrative Priority Test"). *Amalgamated Ins. Fund,* 789 F.2d at 101; *Mammoth Mart,* 536 F.2d at 954.

■ There also must be an element of inducement "a creditor provides consideration to the bankrupt estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. If the inducement came from a pre-petition debtor, then consideration was given to that entity rather than to the debtor-in-possession. However, if the inducement came from the debtor-in-possession, then the claims of the creditor are given priority." *Drexel,* 134 B.R. at 489 (quoting *In re Jartran, Inc.,* 732 F.2d 584 (7th Cir.1984)). Niagara Mohawk assert that it is entitled to an administrative expense claim for the Debtor's actual usage of energy, that Niagara Mohawk provided, post-petition through the Debtor's actual rejection of the Niagara Contracts. Pursuant to the terms of the Plan, approved by this Court's April 21, 2004 Order, the Debtor rejected the Niagara Contracts. According to Niagara Mohawk the Debtor's actual usage during the post-petition period resulted in invoices totaling $7,520,729.81.[6] However, the Debtor made payments totaling $2,841,426.99 leaving a balance due and owing Niagara Mohawk $4,679,302.82. Niagara contends that the Debtor's usage of the low-cost energy allowed it to continue to operate during the post-petition period of time, and keep alive the option to sell the Niagara Facility as a going concern. Therefore because of Niagara Mohawk's services there was an actual and necessary expense to preserving the estate. In addition, Niagara Mohawk asserts that the issue of the "actual and necessary" nature of the electric service provided to the Niagara Facility, as a means of preserving the estate, was resolved by the 366 Order, which pro-

---

**6.** Niagara Mohawk arrived at this figure by using the market rate (the "Tariff Rate") and not the Niagara Contract Rate, which is a low cost rate pursuant to the NRA. This Tariff Rate that is asserted by Niagara Mohawk is the market rate they contend they charge their large industrial users who are not subject to the low-cost power replacement or expansion contracts.

vided that "unpaid charges for the post-petition services provided by [Niagara Mohawk] to the Debtor constitute actual and necessary expenses of preserving the Debtor's estate…in addition, with respect to those claims for amounts incurred after April 2, 2003, [Niagara Mohawk] is hereby granted an administrative expense priority." *366 Order at ¶ 7.*

The Debtor, argues that Niagara Mohawk is not entitled to an administrative claim because its claim is a contract claim as an effect of the rejection and because of that Niagara Mohawk's claim is at best a general unsecured claim for rejection damages. Further, Niagara Mohawk did not file a timely administrative claim pursuant to this Court's Administrative Claim Bar Date Order dated January 16, 2004 (the "Administrative Claim Bar Date Order") setting February 20, 2004 as the administrative claim bar date (the "Administrative Claim Bar Date"). Finally, Niagara Mohawk cannot establish any benefit to the Debtor's estate to establish an entitlement to administrative priority.

█ There is no dispute that the Niagara Contracts were executory contracts pursuant to 11 U.S.C. § 365, created pre-petition with the Debtor (including its predecessors) and Niagara Mohawk. The Niagara Contracts were in effect and viable until their rejection upon this Court's Order approving the Plan. It is undisputed that the Niagara Contracts pursuant to the NRA and New York State statutory authority provided the Debtor with low-cost energy. Further, there is no dispute that there was utilization of the low-cost by the Debtor during the post-petition, pre-rejection period. The issue in dispute is whether upon that rejection of the Niagara Contracts does the Debtor's usage post-petition and pre-rejection constitute an administrative expense priority?

█ This Court finds that there was a transaction between the Debtor and Niagara Mohawk, which included Niagara Mohawk supplying energy to the Debtor for its utilization at the Niagara Facility pursuant to the Niagara Contracts. Further, pursuant to the 366 Order as a means of adequate assurance to continue their post-petition relationship the Debtor provided Niagara Mohawk with the following guarantee:

Debtor agrees that, pursuant to section 503(b)(1)(A) of the Bankruptcy Code, any and all unpaid charges for postpetition services provided by [Niagara Mohawk] to the Debtor constitute actual and necessary expenses of preserving the estate . . . . In addition, with respect to those claims for amounts incurred after April 2, 2003, [Niagara Mohawk] is hereby granted an administrative expense priority claim in the Debtor's estate and such claim shall be *pari passu* with other administrative claims and shall be junior only to the claims of the DIP Credit Facility.

366 Order at ¶ 7. This promise of an administrative priority for unpaid post-petition services induced Niagara Mohawk to continue providing its services to the Debtor. Now because the Debtor has seen fit to reject the Niagara Contract, it cannot change its position that was previously outlined to Niagara Mohawk and this Court. The Debtors actions, specifically the 366 Order, precludes the Debtor from now claiming that Niagara Mohawk's right to an administrative priority does not exist. As the court in *Bethlehem* recognized, the law in this circuit, "any assertion of a legal right by a debtor that is inconsistent with the debtor's prior words or acts is improper as a matter of law, where a non-debtor relied upon such prior words or acts." 291 B.R. at 265 (citing *In re Ionosphere Clubs, Inc.,* 85 F.3d at 999 (2d Cir.1996); *Readco, Inc. v.Marine Midland*

*Bank*, 81 F.3d 295, 301 (2d Cir.1996)). This representation is also made in the Debtor's Utility Motion, again stating that utility companies are "adequately assured of payment given ... post-petition utility charges shall have administrative expense priority pursuant to sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code." Thus, the Debtors are estopped from arguing against the administrative expense status of Niagara Mohawk's claim. Both in the 366 Order and the Utility Motion there is no designation as to if the administrative priority status granted is some how changed upon rejection or assumption, and thus because it is a blanket assertion without qualification this Court is to read it as such.

Pursuant to 11 U.S.C. § 503, the focus is on the actual services provided during the post-petition period, and whether those services were actual and necessary to the preservation of the estate (i.e., a "benefit" to the estate). Notwithstanding the Utility Motion and the 366 Order, the Debtor continued to utilize the energy provided by Niagara Mohawk and therefore was able to continue to operate the Niagara Facility, there would have been no Debtor operation without the energy services provided by Niagara Mohawk. It is difficult to imagine how a debtor could operate its business without access to utilities necessary for lighting, heat, and/or the operation of equipment, as well as the multiple other needs of an ongoing business. Therefore, Niagara Mohawk is entitled to administrative expense priority which leads to the next question of which rate shall prevail, the Niagara Contract Rate or the Tariff Rate.

## II. Administrative Bar Date

Before this Court addresses the applicable rate to Niagara Mohawk's claim, first there must be a determination of preclusion of Niagara Mohawk's claim because it may have been filed out of time pursuant to Administrative Claims Bar Date Order.

The Debtor argues that this Court established February 20, 2004 as the Administrative Claims Bar Date and Niagara Mohawk was adequately served (*See* Debtor's Response Exhibit C). Despite those factors Niagara Mohawk did not file an administrative claim prior to the Administrative Claims Bar Date. Therefore, because of Niagara's failure to timely file an administrative claim it is so barred. *See Administrative Claims Bar Date Order*, pp. 3–4. Bankruptcy courts routinely enforce administrative bar date orders that were properly obtained and served on creditors. *See In re Bondi's Valu–King, Inc.*, 126 B.R. 47 (N.D.Ohio 1991)(enforcing administrative bar date against new administrative claim). "Bar dates are like statute of limitations which must be strictly observed." *In re Manville Forest Products Corp.*, 89 B.R. 358, 374 (Bankr. S.D.N.Y.1988). Bar dates apply to creditors who have reason to believe they have a claim, even if the claim has not yet accrued. *See First Fidelity Bank, N.A. v. Hooker Investments, Inc., L.J. (In re Hooker Investments, Inc.)*, 937 F.2d 833, 837–38 (2d Cir.1991). Recognizing and understanding all those principles the Court deems Niagara Mohawk's Claim timely filed as within the period required by the Plan.

The Administrative Claims Bar Date Order provides that "the following persons or entities are not required to file a Proof of Claim by the Administrative Claims Bar Date: ... holders of Administrative Expense Claims previously allowed by order of this Court." *Administrative Bar Date Order*, p. 3. Therefore, pursuant to the 366 Order, which is a stipulation between the parties so ordered by this Court, granting Niagara Mohawk a administrative expense claim for post-petition services provided by

Niagara Mohawk; Niagara Mohawk was not required to file a request for payment of their administrative expense claim. There was no reason to file another administrative claim on or before the bar date provided.

The Debtor's Second Amended Plan of Reorganization provides:

138. *Bar Date for Other Administrative Claims.* Unless the Plan or the Court fixes a different date, all Claims against the Debtor for Administrative Claims, with the exception of Fee Claims, shall be filed not later than thirty (30) days after the Effective Date. All such Claims not timely filed shall be forever barred. The Debtor and any other party in interest may object to the allowance of any such Claim filed before, on, or after the Effective Date.

*Debtor's Second Plan of Reorganization,* p. 33. The Effective date of the Plan was May 11, 2004. *See Notice of Effective Date Pursuant to the Debtor's Plan of Reorganization* dated May 11, 2004. The Plans' administrative claims bar date is June 10, 2004. *See Debtor's Second Plan of Reorganization,* p. 33. Niagara Mohawk's motion was filed on May 19, 2004, therefore in time and not barred pursuant to the administrative bar date set by the Plan.

### III. Administrative Expense Claim Calculation

This Court having determined that Niagara Mohawk is entitled to an administrative claim priority there must be a determination of the reasonable value of the services provided to the Debtor. In the case where a "debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *In re Patient Education Media, Inc.,* 221 B.R. 97, 101 (Bankr. S.D.N.Y.1998). There is an initial presumption that the contractual rate is the reasonable value of the goods or services provided to the estate which can only be overcome with convincing evidence to the contrary. *See Bethlehem,* 291 B.R. at 264 ("The presumption is favor of the contract price is viable unless the [party challenging that rate] introduces convincing evidence to the contrary."). However, this Court having determined that Niagara Mohawk is entitled to administrative claim expense and understanding how that determination may affect all parties in interest involved, the rate determination requires additional evidence. The lack of evidence within the submissions before the Court requires additional submission as to why this Court should apply the Tariff rate versus the Niagara Contract rate. Therefore the Court outlines the following briefing schedule regarding this specific issue, there will be simultaneous briefs by Niagara Mohawk and the Debtor due July 30, 2004 at 4:00 p.m. and then simultaneous replies due August 7, 2004 at 4:00 p.m.

### CONCLUSION

For all of the foregoing reasons, Niagara Mohawk's motion is granted in part and this matter will continue pending the completion of the parties submission pursuant to this Court's briefing schedule.